IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KRISTEN JOANNA JOHNSON ) | |
| FORMERLY KNOWN AS KRISTEN ) | |
| JOANNA GOYETTE ) | |
|                                 ) | |
| Plaintiff, ) | |
|                                 ) | |
| v.                         ) | Case No. 11-CV-188-PJC |
|                                 ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
|                                 ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Kristen Joanna Johnson, formerly known as Kristen Joanna Goyette ("Johnson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the Decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Johnson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Johnson was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Johnson was 37 at the time of the April 13, 2009 hearing before the ALJ. (R. 29, 51, 60). She had worked as a paralegal and secretary at various law firms from around 1994 to 2006. (R. 36-41). After being terminated from a job because she "couldn't keep up...[p]hysically" with

tasks such as filing, lifting, copying, and going to court, Johnson worked for two days at an architectural firm, but she quit because the office did not have an elevator, and she could not walk up the stairs. (R. 40-41, 56).

Johnson testified that she had pain in both knees which made it impossible to walk more than about half a block. (R. 46). She said that she had arthritis and swelling in both knees. *Id*. She described difficulties in walking. (R. 48-52). At the time of the hearing, a surgery was planned for the left knee. (R. 50). Johnson testified that she had undergone five surgeries on her right knee and six surgeries on her left knee. (R. 41). Johnson estimated that each surgery had required recovery time of a month to a month and a half, including around three weeks using crutches. (R. 44). Her surgeries began before she stopped working in 2006, and her doctor had communicated that he planned to replace both her knees in the next eight years, around the time Johnson would be 45. (R. 41, 49-50). Johnson testified that her arthritis pain had also been treated with cortisone steroid injections. (R. 48). Johnson took Ibuprofen, Ultram,[1] Lortab, and Paxil on a daily basis. (R. 54). Johnson wore a knee brace as instructed by her doctor. (R. 45). Johnson had previously had a lot of physical therapy, but was not in physical therapy at the time of the hearing. (R. 47).

Johnson testified that before her knee problems began, she played softball, water skied, snow skied, and ran. (R. 42-43). She had not engaged in these kinds of activities since 2003 or 2004, and had consequently gained around 50 pounds. *Id.* Johnson's 19-year-old daughter lived with her and assisted her. (R. 52, 55). Johnson explained that she could do grocery shopping or similar activities, but after 30 minutes her knees would begin to swell and to give her pain. (R.

---

[1] Ultram is taken for the management of moderate to moderately severe pain in adults. *www.pdr.net*

53-54). She could drive and do "minimal" housework like cooking breakfast. (R. 51). In the morning, Johnson had difficulty getting out of bed, and it took her as much as two hours of doing exercises and moving around the house to reduce the stiffness in her knees. (R. 54).

Bradley W. Bruner, M.D., of Wichita, Kansas, operated to repair a possible lateral meniscus tear to Johnson's right knee on October 20, 2000.[2] (R. 409-11). During the surgery, Dr. Bruner found the tear and repaired it. *Id*. This surgery was followed by another surgery on April 13, 2001, in which Dr. Bruner performed a partial lateral meniscectomy and removed dart fragments that had been left during the first surgery. (R. 406-08). On September 21, 2001, Johnson underwent a third surgery to perform a partial lateral meniscectomy on her left knee. (R. 403-05).

Records show that Johnson attended physical therapy sessions in 2002 through 2004. (R. 375-86).

On March 22, 2002, Dr. Bruner performed an arthroscopic lysis of adhesion in an attempt to correct "scar tissue impingement versus lateral meniscus tear of the left knee." (R. 400-02).

On November 7, 2002, Johnson had a check-up with Dr. Bruner. (R. 360). She had received two injections in her knee in the preceding two weeks, one of which had "got rid of all the radiating pain down her leg," but the second of which had been ineffective. *Id*. Dr. Bruner gave Johnson Prednisone for swelling and discussed having a therapist perform "scar tissue manipulations." *Id*.

---

[2] Johnson's appeal relates to her knee and ankle problems. Plaintiff's Opening Brief, Dkt. #16. The undersigned has not summarized records included in the administrative transcript that do not relate to knee and ankle problems but relate to other conditions, such as Johnson's migraines, seizures, and substance abuse. (R. 419-42, 449-94, 515-30, 543-49, 556-87, 655-75).

On December 9, 2002, Dr. Bruner operated on Johnson's right knee. (R. 397-99). He diagnosed her with having a "redundant fat pad," which he attempted to correct with a "fat pad resection." *Id*.

On January 14, 2003, Dr. Bruner indicated that there was improvement in Johnson's knee. (R. 357). On January 28, 2003, Dr. Bruner wrote that Johnson was having increased "catching sensations" in her right knee, and he gave her an injection of Lidocaine and DepoMedrol, and another injection was done on February 13, 2003. (R. 356). On March 14, 2003, Johnson underwent a bone scan to check for a possible stress fracture, but none was found. (R. 387). On March 25, 2003, Johnson's diagnosis was "early degenerative lateral compartment arthritis." (R. 353). Between April 1 and April 22, 2003 Johnson received five Hyalgan injections in her left knee. (R. 349-52). Johnson received injections of Lidocaine and DepoMedrol on June 20 and July 22, 2003. (R. 347-48).

On September 10, 2003, Johnson underwent another arthroscopic lysis of adhesions in order to correct scar tissue impingement of the left knee. (R. 394-96). On September 23, October 9, and December 18, 2003, Johnson received prescriptions of Keflex[3] and Lortab. (R. 342-45). During these visits, Dr. Bruner diagnosed Johnson with "mildly excessive scar formation, right knee and scar tissue impingement in the left knee." (R. 342-44). On November 24, 2003, an arthroscopic lysis of adhesions and a partial lateral meniscectomy were done. (R. 391-93).

---

[3] Keflex is used for the "treatment of otitis media and skin and skin structure (SSSI), bone, genitourinary tract, and respiratory tract infections caused by susceptible strains of microorganisms." *www.pdr.net*

4

Johnson saw Dr. Bruner on January 8, 2004, reporting that she had fallen and hit her knee, causing irritation to her surgical scar and to the knee itself, and she saw him again for this complaint on January 22. (R. 341). On March 16, April 13, May 11, June 8, June 29, August 19, and September 16, 2004, Dr. Bruner injected Johnson's knees with Lidocaine, Marcaine, and DepoMedrol, and he reported that she had bilateral scar tissue impingement. (R. 332-38). During the September 16, 2004 visit, Johnson reported that she had been doing well, but then she had "twisted, popped and hurt her knee." (R. 332).

On September 27, 2004, Johnson saw Linus Ohaebosim, D.O. for vomiting and diarrhea. (R. 564). Dr. Ohaebosim noted that Johnson's medical problems included a stress fracture in her left foot and "degenerative bones" and "knees," and he treated these problems with pain medication. *Id*. Dr. Ohaebosim also noted Johnson's knee pain in a visit on January 27, 2005. (R. 567).

On January 25, 2005, Johnson had an appointment with Kevin C. Hoppock, M.D. and she complained of knee pain. (R. 432). Dr. Hoppock prescribed Naprosyn, but noted that injections or another surgery might be necessary. *Id*.

On August 15, 2005, Johnson saw Kenneth A. Jansson, M.D. (R. 502-03, 505). He wrote that he believed that she had a patellofemoral arthralgia with tight lateral retinaculum. (R. 502). Dr. Jansson referred her to physical therapy, and recommended that there be an arthroscopic examination with a lateral retinacular release. *Id*.

Johnson was apparently in a car accident on April 17, 2006. (R. 497). On April 20, 2006, MRI studies of both of Johnson's knees were performed. (R. 550-51). The reviewing physician's impression of the study of the left knee was indeterminate regarding whether the meniscus had a possible tear or showed prior post-surgical change. (R. 550). The report also

noted small knee joint effusion and stated that no other significant internal derangement was found. *Id.* The report for the right knee stated that there was an absence of the posterior horn of the lateral meniscus that was presumed to be a postsurgical change. (R. 551). The report noted small knee joint effusion and stated that there was no other significant derangement. *Id.*

On April 23, 2006, Johnson presented to the emergency room at Wesley Medical Center, reporting that she had earlier injured her right knee in a car accident. (R. 516-19). She was given pain medication, and directed to follow up with her doctor. *Id*.

On May 3, 2006, Johnson saw Dr. Jansson for follow-up after the April 17, 2006 car accident. (R. 499-501). The notes state that Johnson had been tolerating her knee pain since August 2005. (R. 499). She reported that she was injured in the car accident, hitting her knees on the dashboard and resulting in significant, ongoing pain. *Id.* On examination of her right knee, she had good range of motion and good stability. *Id.* She had some "grind and crepitus." *Id.* There was no effusion detected. *Id.* Examination of her left knee showed pain and a "very tight lateral retinaculum." *Id.* Dr. Jansson's impression was bilateral "arthralgia with lateralization of her patella femoral joint and possibly continued lateral meniscus tear in the left knee." *Id.* He recommended "arthroscopy, chondroplasty patella, and lateral release" for both knees. *Id.* He recommended that Johnson continue on Naprosyn, and he did not want to prescribe narcotics. (R. 500). He would not do any injections because they would probably not "solve her problem," and he recommended physical therapy. *Id.*

On May 10, 2006, Johnson presented as a new patient to Brian DeBrot, M.D. (R. 610-11). She was diagnosed with chronic knee pain and a lateral meniscus tear of the left knee. (R. 611). She was given an injection to her right knee at her request. *Id.* Johnson saw Dr. DeBrot on June 5 and June 30, 2006. (R. 606-09). The diagnoses and treatment plan were the same, and

6

Johnson was given a refill of Lortab at the June 5 appointment. (R. 609).

After Johnson's report that she had recently fallen, x-rays of her left knee and her right ankle on August 24, 2006 showed "no acute bony abnormality." (R. 513, 585).

Johnson had an office visit with Dr. DeBrot on September 5, 2006. (R. 604-05). The assessment was that she had ankle pain, and she received a refill for Lortab. (R. 605). On November 11, 2006, Johnson complained of neck pain, and she reported that she took medication such as Motrin frequently. (R. 602-03). She was diagnosed with chronic knee pain, and she was prescribed Lortab for pain. (R. 603).

Johnson was seen by Sidney Stranathan, D.O. and a physician's assistant for care from November 2006 through February 2007. (R. 616-25, 633-41). On November 22, 2006, Johnson was seen by the physician's assistant, and she was assessed with bilateral patellofemoral arthralgias. (R. 623). She was prescribed Ultram[4] and Lexapro.[5] *Id.* Johnson said that she was waiting to have surgery and was seeking employment so that she could secure medical insurance to pay for the surgery. *Id*.

On April 17, 2007, Johnson was seen by Michael P. Estivo, D.O, (R. 650). Dr. Estivo's assessment described her ailment as "right knee pain, internal derangement of right knee, and subluxing patella right knee." *Id.* After discussing options, risks, and benefits with Dr. Estivo, Johnson decided that she wanted arthroscopy on her right knee and possible arthrotomy. *Id.* On June 7, 2007, Dr. Estivo again examined Johnson. (R. 652-53). Dr. Estivo gave Johnson the same assessment and reported that Johnson wanted to go forward with surgery. (R. 653).

---

[4] Ultram is used for the management of moderate to severe pain. *www.pdr.net*

[5] Lexapro is used in the treatment of generalized anxiety disorders. *www.pdr.net*

On May 21, 2007, agency examining consultant Robert Frederic Greiner, D.O., evaluated Johnson. (R. 643-47). Dr. Greiner noted Johnson's seven-year history of "bilateral knee pain, neck and lumbosacral back pain" with a total of eight knee surgeries and prescription Flexeril and Lortab for "breakthrough pain." (R. 643). Johnson had never had joint replacement surgery, did not use walking devices, had not received epidural treatment, had not undergone chiropractic therapy, and had not used a TENS unit. (R. 643-44). Johnson asserted that her knee problems affected her in a number of ways, including waking in the night from pain, morning stiffness for 30 minutes after waking, and inability to "move anything...wash or mop." *Id.* She also said that she could not sit for longer than 20 minutes, stand for five minutes, or walk for 20 minutes without "being limited by discomfort." *Id*. Dr. Greiner observed that Johnson had full range of motion of her knees, cervical spine, and lumber spine, and she had no motor or sensory deficit. (R. 646). Johnson's gait was mildly impaired, and she had mild difficulties with orthopedic maneuvers. *Id*.

On July 20, 2007, nonexamining agency consultant Ron Rohleder completed a Physical Residual Functional Capacity Assessment form. (R. 676-83). He found that Johnson could frequently lift and/or carry 25 pounds and could occasionally lift and/or carry 50 pounds. (R. 677). She could stand, walk, or sit for six hours in an eight-hour work day. *Id*. She could frequently climb, balance, and crawl, and occasionally stoop, kneel, and crouch. (R. 678). Rohleder indicated no other functional limitations. (R. 676-83). For narrative explanation, Rohleder noted that, despite Johnson's multiple surgeries, she still had a normal range of motion and "only mildly impaired gait and movements." (R. 677). He found that any seizure disorder Johnson suffered from did not make her disabled, and that there was insufficient medical evidence to prove her migraines. *Id*. On October 10, 2007, nonexamining agency consultant

8

Kyle Timmerman, M.D., affirmed Rohleder's RFC assessment. (R. 685).

Dr. Ohaebosim wrote a letter dated January 20, 2009 in which he described Johnson as his patient, listed her surgeries, and opined that Johnson's ailments were a "degenerative process." (R. 686). He wrote that she would experience pain and stiffness for the rest of her life. *Id*. Dr. Ohaebosim noted that Johnson had difficulty with mobility, including walking a block without a knee brace, engaging in weight bearing activities, and climbing stairs. *Id*. Dr. Ohaebosim stated that it was likely that Johnson would need more surgeries. *Id*. Dr. Estivo wrote a letter dated February 3, 2009 listing Johnson's knee surgeries, and stating that, given her medical history, "it is certainly a reasonable possibility that she will continue to experience pain and limitations secondary to her knee problems." (R. 687). Dr. Estivo also stated that Johnson might require more knee surgeries in the future. *Id.*

After the ALJ's June 17, 2009 decision, Kenneth R. Trinidad, D.O., board certified in internal medicine, examined Johnson and wrote a report dated August 12, 2010 providing his assessment of her medical condition. (R. 688-91). Dr. Trinidad also completed a form entitled "Physical Medical Source Statement." (R. 692-694). Dr. Trinidad tested Johnson's range of motion in her knees, ankles, wrists, and neck, as well as her grip strength and her forearm strength. (R. 688, 690). He noted that there was "crepitance" and "tenderness" in her limbs. *Id*. Dr. Trinidad diagnosed her medical condition as Ehlers-Danlos syndrome, a hereditary disorder that causes hyperflexibility and hyperextension, resulting in joint problems. (R. 690-91). Dr. Trinidad attributed a variety of Johnson's ailments to Ehlers-Danlos syndrome, including

9

recurrent subluxation[6] of the patellae and the development of traumatic chondromalacia[7] in both knees; lateral epicondylitis and bursitis in both elbows; laxity of the ligaments in her neck resulting in chronic sprains; instability in her ankles resulting in recurrent sprains; and problems gripping or performing repetitive motions, such as typing, with her hands. (R. 688-89). In his comments on each of these problems, Dr. Trinidad mentioned the various treatments Johnson had received over the years to try to correct these problems. *Id*.

On the Physical Medical Source Statement, Dr. Trinidad indicated that Johnson could sit for a period of two hours, stand for thirty minutes, and walk for ten minutes, with totals for an 8-hour day of sitting for 3 hours, standing for one hour, and walking for 10 minutes. (R. 692). He found that she could occasionally lift or carry up to 20 pounds. *Id*. He found that her use of her feet and hands for repetitive motion was limited. (R. 693). Johnson could occasionally bend or reach, but could never squat, crawl, or climb. *Id*. Johnson could never be exposed to unprotected heights, and she had moderate restrictions on exposure to moving machinery, driving, and vibration. *Id*. Johnson had mild restrictions on exposure to dust and marked changes in temperature and humidity. *Id*. Dr. Trinidad cited as "objective medical evidence" for this evaluation: "Ehler-Danlos syndrome with involvement of knees, elbows, wrists, ankles, and cervical spine." *Id*.

---

[6] Subluxation is "an incomplete or partial dislocation." Dorland's Illustrated Medical Dictionary 560 (29th ed.).

[7] Chondomalacia is the "softening of the articular cartilage, most frequently in the patella." Dorland's Illustrated Medical Dictionary 560 (29th ed.).

**Procedural History**

On December 19, 2006, Johnson filed applications for disability insurance benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 187-200). She alleged an onset date of January 1, 2004. (R. 193). The applications were denied initially and on reconsideration. (R. 64-68, 74-82). A hearing before ALJ Robert Burbank was held on April 13, 2009 in Wichita, Kansas. (R. 29-57). By decision dated June 17, 2009, the ALJ found that Johnson was not disabled. (R. 18-28). On May 15, 2010, the Appeals Council denied review of the ALJ's findings. (R. 6-8). On September 1, 2010, Johnson requested that her case be reopened. (R. 321-23). The Appeals Council again denied review on January 25, 2011. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[8] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[8] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe

11

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

(Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ found that Johnson's date last insured was December 31, 2010. (R. 20). At Step One, the ALJ found that Johnson had engaged in substantial gainful activity until February 1, 2006. *Id*. Therefore, February 1, 2006 was the earliest possible onset of disability date. *Id*. At Step Two, the ALJ found that Johnson had a severe impairment of "status/post multiple bilateral knee surgical repairs." *Id*. At Step Three, the ALJ found that Johnson's impairments did not meet a Listing. *Id.*

The ALJ found that Johnson had the RFC to perform the full range of sedentary work. (R. 23). At Step Four, the ALJ found that Johnson could perform her past relevant work as a legal secretary. (R. 27). At Step Five, as an alternative finding, the ALJ found that there were jobs in significant numbers in the national economy that Johnson could perform, taking into account her age, education, work experience, and RFC. (R. 28). Therefore, the ALJ found that Johnson was not disabled from January 1, 2004 through the date of his decision. *Id*.

**Review**

Johnson raises one issue on appeal: "Was the decision of the Commissioner not to remand plaintiff's applications due to new, material medical evidence supported by substantial evidence?" Plaintiff's Opening Brief, Dkt. # 16, p. 6. Johnson's argument relates to Dr. Trinidad's report dated August 12, 2010, finding that Johnson had Ehlers-Danlos syndrome and concluding that the syndrome was the cause of her ongoing knee problems, ankle problems, and other joint problems. (R. 688-694).

The Appeals Council considered Dr. Trinidad's report and made it a part of the record. (R. 1-5). There is no requirement that the Appeals Council give a specific analysis of new evidence. *Martinez v. Astrue*, 389 Fed. Appx. 866, 868-69 (10th Cir. 2010) (unpublished). It is

sufficient that the Appeals Council "explicitly states that it considered the evidence." *Id*. Here, the Appeals Council complied with this requirement. (R. 1). Because the Appeals Council considered Dr. Trinidad's report and made it a part of the record, the report is now part of the administrative record for this Court to consider when evaluating the ALJ's decision for substantial evidence. *Martinez*, 389 Fed. Appx. at 868-69; *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994); *Blea v. Barnhart*, 466 F.3d 903, 908 (10th Cir. 2006). Therefore, the real issue before the Court is whether the record, including the opinion of Dr. Trinidad, still contains substantial evidence to support the decision of the ALJ. *Martinez*, 389 Fed. Appx. at 869.

This Court's decision, that there remains substantial evidence supporting the ALJ's decision, is based on the difference between a retrospective diagnosis and a retrospective opinion of disability. The Tenth Circuit has repeatedly stated that a "retrospective diagnosis without evidence of actual disability is insufficient" to prove that a plaintiff was disabled at a certain point in time. *Potter v. Secretary of Health & Human Services*, 905 F.2d 1346, 1348-49 (10th Cir. 1990); *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir.1991). *McKinney v. Barnhart*, 62 Fed. Appx. 284, 285-86 (10th Cir. 2003) (affirming the ALJ's denial of benefits where the claimant was retrospectively diagnosed with a brain tumor, but there was no evidence that she was "actually disabled" during the relevant time) (unpublished); *see also Armijo v. Astrue*, 385 Fed. Appx. 789, 797 (10th Cir. 2010). Retrospective diagnosis does not necessarily show retrospective disability, and this "is especially true where the disease is progressive." *Potter*, 905 F.2d at 1348-49.

In *Potter*, the claimant asserted that she was disabled in 1980, before her date last insured of December 31, 1981, although she was not diagnosed with multiple sclerosis until 1985. *Id.* at 1348. She testified that she began experiencing painful numbness and tingling in her extremities

14

in 1980.  *Id.*  A physician in 1981 stated that the claimant definitely had a neurological dysfunction, possibly of a demyelinating type.  *Id.*  Opinions of physicians were submitted after the claimant's application in 1985, all of which linked her symptoms from 1980 and 1981 to her later diagnosis of multiple sclerosis, but those opinions did not "support a finding that she was continuously disabled for twelve months in 1980-81."  *Id.*  Their retrospective diagnosis of a disease did not address the relevant question of "whether the claimant was actually *disabled*" during the relevant period.  *Id.* at 1348-49 (emphasis original).

In the present case, Dr. Trinidad gave an opinion that Johnson had been suffering from Ehlers-Danlos syndrome during the relevant period, and so his opinion gives a retrospective diagnosis.  However, as in *Potter*, Dr. Trinidad's report does not establish that Johnson was *disabled* during the relevant period.  Thus, Dr. Trinidad's report does not change the validity of the ALJ's finding that Johnson was not disabled, which remains supported by substantial evidence.

The Court briefly addresses two arguments made by Johnson that do not affect the analysis here.  In her reply brief, Johnson quotes extensively from Social Security Regulation 83-20, 1983 WL 31249, on the manner by which an ALJ should determine the onset date of a disability.  Plaintiff's Reply Brief, Dkt. #18, pp. 1-3.  The question of onset is not before this Court, because the only issue that Johnson raised in her appeal was whether Dr. Trinidad's report was new evidence that affected whether the ALJ's decision was supported by substantial evidence.  As discussed in full above, Dr. Trinidad's retrospective diagnosis did not provide evidence of retroactive disability.  *Banning v. Barnhart*, 35 Fed. Appx. 785, 786-87 (10th Cir. 2002) (unpublished) (even though the claimant submitted a new psychological report after the ALJ's decision, "remand was unwarranted because no newly-submitted relevant medical

15

evidence suggested that Mrs. Banning was disabled before" the date of the ALJ's decision denying benefits). Given that Dr. Trinidad's report did not provide new evidence that Johnson was disabled before the date of the ALJ's decision, the question of onset is not relevant and provides no basis for reversal.

A second issue raised by the parties that is not relevant to the Court's inquiry here is what weight should be assigned to Dr. Trinidad's opinion based on his credentials and his relationship with Johnson. Defendant's Brief, Dkt. # 17, pp. 3-4; Plaintiff's Reply Brief, Dkt. #18, p. 3. Determining the comparative weight of Dr. Trinidad's opinion versus the other opinion evidence would only be dispositive in this case if Dr. Trinidad's evaluation were relevant to the discussion of Johnson's disability during the period in question. Because his opinion gives a retrospective diagnosis without any opinion regarding retrospective functional limitations, Dr. Trinidad's report lacks relevance to the time period, and it need not be weighed against the opinions of other physicians.

Johnson argues that the Appeals Council erred by not remanding her case to the ALJ so that the ALJ could consider the report from Dr. Trinidad. There was no error in the actions of the Appeals Council. The undersigned has considered whether, in light of Dr. Trinidad's report, there remains substantial evidence in the record to support the finding that Johnson was not disabled during the relevant period. Because Dr. Trinidad's report contained only a retrospective diagnosis of a condition and not a retrospective diagnosis of actual disability, it did not affect the decision of the ALJ, which remains supported by substantial evidence. The decision of the ALJ is affirmed.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 13th day of July 2012.

Paul J. Cleary
United States Magistrate Judge